AUTO-OWNERS INSURANCE COMPANY v BLUE CROSS & BLUE
SHIELD OF MICHIGAN

Docket No. 67355. Submitted November 9, 1983, at Grand Rapids.—
Decided March 20, 1984.

Cheryl J. Stirdivant was injured in an automobile accident on
May 31, 1977. At that time, she was insured through her
employer for hospital and medical expenses under a basic
hospital care certificate, a basic medical care certificate, and a
supplemental benefit certificate issued by defendant Blue Cross
& Blue Shield of Michigan. The defendant's certificates pro-
vided that coverage was to terminate automatically upon the
insured's loss of group eligibility or the nonpayment of a
premium. Such termination was to be effective at the end of
the monthly period in which a failure to pay or a termination
of group eligibility, i.e., termination of employment, occurred.
The certificates also provided a conversion privilege entitling
the insured to convert to a group conversion plan at the cost of
$139 a month, by written notice to the insurer within 30 days
after the end of the monthly payment period in which the
eligibility terminates. Mrs. Stirdivant was unable to resume
her teaching duties for her employer in September of 1977, due
to her injuries. The employer paid the defendant premiums on
her behalf until it removed her from the payroll and stopped
paying premiums on October 1, 1977. Defendant then mailed a
group conversion contract and billing for $139 to Mrs. Stirdi-
vant. The bill was never paid nor was the conversion privilege
otherwise exercised. When the accident occurred, Mrs. Stirdi-
vant was also covered for the medical and hospital costs in-
curred as a result thereof under a no-fault automobile insur-
ance policy issued to her husband by the plaintiff, Auto-Owners
Insurance Company. Following Mrs. Stirdivant's termination of

REFERENCES FOR POINTS IN HEADNOTES
[1, 2] 73 Am Jur 2d, Summary Judgment §§ 26, 27.
[3] 44 Am Jur 2d, Insurance §§ 1857-1859.
Termination of coverage under group policy with regard to termina-
tion of employment. 68 ALR2d 8.
[4] 43 Am Jur 2d, Insurance § 283.
[5] 44 Am Jur 2d, Insurance § 1893 et seq.

employment, the defendant ceased making payments and the plaintiff paid for the medical and hospital costs incurred after October 1, 1977. On May 1, 1980, plaintiff filed a complaint in the Kent Circuit Court against the defendant seeking a declaratory judgment, alleging that under a coordination of benefits clause it was entitled to an offset in the amount of benefits which Mrs. Stirdivant should have received from the defendant. Defendant filed an answer and affirmative defenses on September 18, 1981. Following the submission of two sets of interrogatories to the plaintiff, defendant filed a motion for summary judgment on July 26, 1982. In support of the motion, defendant filed affidavits setting forth the contract provisions, the termination of the coverage, and the fact that the conversion privilege had not been exercised. Plaintiff filed a brief in opposition to the motion, an opposing affidavit, and a first set of interrogatories to the defendant inquiring into the circumstances surrounding the failure to convert. Plaintiff argued that summary judgment would be improvident without first ascertaining whether defendant made more than a cursory effort to notify Mrs. Stirdivant or her family of her right to convert and without further ascertaining the full circumstances of why the conversion privilege was not exercised. The trial court, George V. Boucher, J., rejected the plaintiff's argument and granted a summary judgment for defendant after determining that the circumstances of the failure to convert were not relevant to the situation. Plaintiff appeals alleging that it was error to grant the summary judgment because: (1) a question of fact existed concerning the circumstances surrounding the failure to convert, (2) discovery was not complete, and (3) even though the contract was legally terminated in accordance with the contract and policy provisions, Mrs. Stirdivant's rights to benefits had vested at the time of her injuries and, thus, payment for injury-related expenses should continue after contract termination. *Held:*

1. The trial court correctly determined that the reasons why Mrs. Stirdivant did not exercise her privilege of conversion and the circumstances of receiving notice of her right to convert were not relevant to the motion for summary judgment. The Court of Appeals did not find that a factual situation potentially existed which would have precluded the exercise of a summary judgment under GCR 1963, 117.2(3).

2. The Court of Appeals did not accept the plaintiff's claim that the trial court acted prematurely in granting the summary judgment. First, the plaintiff's request for interrogatories was not made until shortly before the hearing on defendant's

motion for summary judgment; second, the plaintiff's interrogatories pertained exclusively to an irrelevant subject matter; and, third, the facts were simple, not in dispute, and were apparent from the terms of the contract.

3. The language of the defendant's policy clearly discloses that the risk insured was not an accident or a described illness but instead was the expense for services incurred as a result of such accident or illness during the period of the insured's membership in the group. The certificates specifically provide that the contract is automatically terminated once the subscribing member is no longer on the payroll. Such policy language was not ambiguous regarding the risk insured.

4. The rule that an insurance contract will be construed in favor of the policyholder does not come into play where the contract is not ambiguous.

5. Defendant is not liable for the expenses incurred after its coverage was terminated.

6. In a case such as this where the subscribing member is not the plaintiff or even a party to the suit and the dispute is between two insurers, one of whom, the plaintiff, is seeking to avoid liability under its own insurance policy, the plaintiff-insurer is not entitled to the presumptions which could be applied to the subscribing member when a contract ambiguous as to the nature of the risk insured is construed in favor of the party insured. Accordingly, even if the contract in the instant case were ambiguous as to the risk insured, the plaintiff could not prevail.

Affirmed.

1. JUDGMENTS — SUMMARY JUDGMENT — ISSUE OF MATERIAL FACT.

A summary judgment may be granted on the ground that except as to the amount of damages there is no genuine issue as to any material fact where there is no factual situation potentially existing which would preclude the exercise of a summary judgment on that ground (GCR 1963, 117.2[3]).

2. JUDGMENTS — SUMMARY JUDGMENT — DISCOVERY.

A trial court did not act prematurely in granting a summary judgment on the ground that except as to the amount of damages there was no genuine issue as to any material fact prior to the defendant's response to interrogatories filed by the plaintiff where the plaintiff had five years to gather evidence but did not file the interrogatories until shortly before the hearing on the defendant's motion for the summary judgment, the interrogatories exclusively pertained to a subject matter

not relevant to the motion, and the facts in the matter were relatively simple, not in dispute, and were apparent from the terms of the contract involved in the dispute (GCR 1963, 117.2[3]).

3. Insurance — Contracts — Liability for Post-Termination Expenses.

A defendant insurer was not liable for medical expenses resulting from an accident which occurred while the accident victim was insured but which expenses were incurred after insurance coverage of the victim was terminated after the victim was removed from the payroll of the group insured, in a dispute between two insurers regarding liability for such expenses, where the language of the defendant insurer's policy clearly disclosed that the risk insured was not an accident or a described illness but instead was the expense for services incurred as a result of such accident or illness during the period of the insured's membership in the group insured and specifically provided that the contract was automatically terminated once the subscribing member was no longer on the payroll, and where the policy language was not ambiguous regarding the risk insured.

4. Insurance — Contracts — Ambiguity.

An ambiguous insurance contract is to be construed in favor of the party insured, but where a contract is not ambiguous that rule does not come into play.

5. Insurance — Contracts — Ambiguity — Parties.

A plaintiff insurer may not rely on the rule that an insurance contract which is ambiguous as to the nature of the risk insured is to be construed in favor of the party insured in an action between two insurers in which the plaintiff insurer seeks to avoid liability to the injured insured under its own policy by such a construction of the defendant insurer's policy and where the insured party under both contracts is not a party to the suit and in any event will recover from either the plaintiff insurer or the defendant insurer.

*Cholette, Perkins & Buchanan* (by *Jeffrey H. Beusse),* for plaintiff.

*Varnum, Riddering, Schmidt & Howlett* (by *Peter Armstrong, John W. Pestle,* and *Joseph J. Vogan),* for defendant.

Before: ALLEN, P.J., and R. M. MAHER and R. H. BELL,* JJ.

ALLEN, P.J. In this dispute between plaintiff, a no-fault automobile insurer, and defendant, a group hospitalization and medical insurer, over which insurer is responsible for the medical and hospital expenses of Cheryl J. Stirdivant arising out of an automobile accident on May 31, 1977, plaintiff appeals as of right from an order of the trial court dated September 23, 1982, granting summary judgment in favor of defendant under GCR 1963, 117.2(3). The principal issue raised on appeal appears to be of first impression in Michigan.

On the date of the accident, Cheryl J. Stirdivant was a school teacher employed by the Comstock Park School System. In this capacity, she was covered for hospital and medical expenses under a basic hospital care certificate, a basic medical care certificate and a supplemental benefit certificate issued by defendant Blue Cross & Blue Shield of Michigan (BCBS). Mrs. Stirdivant was also covered for the medical and hospital costs incurred as a result of the automobile accident on May 31, 1977, under a no-fault policy issued to her husband by plaintiff, Auto-Owners Insurance Company.

The coverage provided by BCBS was provided under a group contract entered into pursuant to a collective-bargaining agreement between the Comstock Park School District and the union representing the teachers. The scope of the coverage was negotiated between the school district and the union. Under the three certificates which provided the coverage finally agreed upon between the parties, all members of the group were entitled to

---

* Circuit judge, sitting on the Court of Appeals by assignment.

coverage only so long as: (1) they remained eligible members of the group, and (2) the school district continued to pay premiums on their behalf. Upon loss of group eligibility or nonpayment of a premium, coverage was to terminate "automatically" and "without further action on the part of" BCBS. Termination was to be effective at the end of the monthly period in which a failure to pay or termination of eligibility occurred.

The certificates also provided that in the event a teacher lost his or her group coverage, by reason of termination of employment or otherwise, there would be a conversion privilege entitling the teacher to convert to a group conversion plan at a cost of approximately $139 a month. The conversion privilege could be exercised only by written notice to BCBS within 30 days after the end of the monthly payment period in which the eligibility terminated.

Because Mrs. Stirdivant was severely injured in the accident, she was unable to resume her teaching duties in September, 1977. The school district paid premiums on her behalf to October 1, 1977, but removed her from the payroll and stopped paying premiums October 1, 1977. Although not required by the express terms of the contract, BCBS mailed a group conversion contract and billing for $139 to Mrs. Stirdivant. The bill was never paid nor was the conversion privilege otherwise exercised. However, BCBS did not undertake an investigation to determine why the conversion privilege was not exercised.

After BCBS ceased making payments, Auto-Owners picked up the medical and hospital costs incurred after October 1, 1977. On May 1, 1980, Auto-Owners filed a complaint for declaratory judgment, alleging that plaintiff, under the coordi-

nation of benefits clause, was entitled to an offset in the amount of the benefits which Mrs. Stirdivant should have received from BCBS. On July 6, 1981, at a hearing on the call of the no-progress calendar, the suit was removed from the no-progress calendar and on September 18, 1981, defendant filed an answer and affirmative defenses.

Following the submission of two sets of interrogatories to plaintiff, defendant filed a motion for summary judgment on July 26, 1982. In support of that motion, BCBS filed two affidavits setting forth the contract provisions, the termination of coverage and the fact that the conversion privileges had never been exercised. Auto-Owners filed a brief in opposition to the motion, an opposing affidavit and a first set of interrogatories to defendant. The interrogatories inquired into the circumstances surrounding Mrs. Stirdivant's failure to convert. The affidavit recited that Mrs. Stirdivant was comatose during the period in which her conversion privilege was to be exercised. However, plaintiff does not dispute the contract provisions or terms of coverage as set forth in this opinion. Instead, in its brief in opposition to BCBS's motion for a summary judgment and at the hearing on the motion on September 10, 1982, plaintiff argued that summary judgment would be improvident without first ascertaining whether BCBS ever made more than a cursory effort to notify Mrs. Stirdivant or her family of her right to convert and further ascertaining the full circumstances of why the conversion privilege was not exercised.

The trial court rejected plaintiff's argument stating that the claims were "hypothetical" and that "there is no legal basis for any obligation of the insurance company to submit a copy of the certificate to the participant or to explain to her or give

her notice of her right to convert".[1] In its written opinion dated October 4, 1982, the trial court further explained:

"the court does not consider the circumstances of failure to convert to be relevant in this situation. There simply was a failure to convert and defendant's responsibility should properly be limited to the terms of the contract it entered. The court simply doesn't agree with the rather limited authorities relied on by the plaintiff for the proposition that no matter what the contract says, it must be construed or applied to relate to all medical expenses arising from any one accident in perpetuity."

On appeal to us, plaintiff argues that the trial court erred in granting summary judgment because: (1) a question of fact existed concerning the circumstances surrounding Mrs. Stirdivant's failure to convert; (2) discovery was not completed and was still being pursued by both parties, *Goldman v Loubella Extendables*, 91 Mich App 212, 218; 283 NW2d 695 (1979); (3) even though the contract was legally terminated in accordance with the contract and policy provisions, Mrs. Stirdivant's rights to benefits had vested at the time of her injuries and payment for injury-related expenses continues after contract termination. *Myers v Kitsap Physicians Service*, 78 Wash 2d 286; 474 P2d 109 (1970). It is plaintiff's third ground of error which raises a question of first impression in Michigan.

I

Prior to analyzing the issues, it will be helpful to comment on the general posture of this matter. This is not a contest between Cheryl Stirdivant, a

[1] Transcript of trial court's opinion delivered from the bench September 10, 1982.

member of the group, and BCBS, the insurer of the group. Cheryl Stirdivant is not even a party to the suit. Instead, this is a contest between two insurance companies over which is responsible for Mrs. Stirdivant's medical and hospital expenses incurred after the subscriber was no longer carried on the payroll and coverage was cancelled October 1, 1977. Up to that date, BCBS had paid some $54,000. Since October 1, 1977, Auto-Owners has paid such expenses. Regardless of which insurer prevails in this appeal, Mrs. Stirdivant has nothing to gain. Either way, her medical and hospital expenses will be paid.

Indeed, Mrs. Stirdivant might be prejudiced if Auto-Owners prevails on appeal, since in order for Auto-Owners to recover from BCBS, Mrs. Stirdivant or her representatives would have to effectuate conversion. As noted earlier, conversion requires a monthly payment of $139.06 a month, or $1,668.72 a year. In the five-year period between cancellation of the policy on October 1, 1977, and the trial court's written opinion on October 4, 1982, conversion could have cost the Stirdivant family $8,343.60 and would only have duplicated the coverage already supplied under the Auto-Owners no-fault policy.

Given the clear and undisputed language of the medical certificates that coverage was provided to members of the group only so long as they remained members of the group and premiums were paid on the members' behalf and that coverage terminated "automatically" and "without further action" by the insurer, and given the further undisputed fact that Mrs. Stirdivant was removed from the payroll October 1, 1977, and no premiums were received on her behalf since that date, we fail to see how inquiry into the circumstances surrounding the scope or clarity of the notice of

the right to conversion given Mrs. Stirdivant or the reasons why the conversion privilege was not exercised were relevant. BCBS was not required to give any notice.

Therefore, we agree with the trial court that the circumstances concerning the failure to convert are not relevant. Accordingly, we do not find that a factual situation potentially existed precluding the exercise of summary judgment under GCR 1963, 117.2(3). This is not to hold that merely because Mrs. Stirdivant was removed from the payroll and further premiums were not paid, *she* automatically lost all rights against BCBS for benefits for medical and hospital expenses resulting from the accident. That question is explored in issue III of this opinion. But we do hold that even though Mrs. Stirdivant was comatose, the reasons why she did not exercise her privilege of conversion and the circumstances of receiving notice of her right to convert were not relevant to the motion for summary judgment.

## II

Was summary judgment improper because discovery was still being processed at the time the motion for such judgment was made and decided? Auto-Owners contends that even though it filed suit on May 1, 1980, and did not ask for interrogatories from defendant until August 18, 1982, the grant of summary judgment on September 23, 1982, was still invalid because defendant had not responded to plaintiff's interrogatories. In support of this argument, plaintiff relies on *Goldman, supra.* We are not persuaded for several sound reasons.

First, plaintiff's request for interrogatories was

not made until shortly before the hearing on defendant's motion for summary judgment. Meanwhile, defendant had sent three sets of interrogatories to plaintiff. Second, plaintiff's interrogatories to defendant exclusively pertained to the circumstances under which Mrs. Stirdivant failed to exercise the right of conversion—a subject matter we have held not to be relevant. Third, unlike the situation in *Goldman* which involved a complex and undisputed factual situation regarding price-fixing, the facts in the instant case were relatively simple, were not disputed, and were apparent from the terms of the contract. We agree with defendant that plaintiff, having had five years to gather evidence from the time BCBS discontinued payments, and having failed to do so, can hardly claim that the trial court acted prematurely.

## III

The main thrust of plaintiff's claim for recovery of hospital and medical expenses incurred after plaintiff was no longer a member of the group insured is predicated on "vesting". Under this theory, a subscriber's right to coverage "vests" at the time the accident or illness occurs and a subsequent cancellation of the policy on grounds that the subscriber is no longer a member of the group does not cut off the subscriber's rights to reimbursement for medical and hospital expenses incurred after cancellation of the policy. Plaintiff cites two cases supporting "vesting". *Myers v Kitsapp, supra,* and the dissenting opinion in *Blue Cross of Florida, Inc v Dysart,* 340 So 2d 970 (Fla App, 1976). Plaintiff submits that the majority opinion in *Dysart* is poorly reasoned and asks this Court to reject it in favor of the dissenting opinion.

Defendant argues that the instant situation does

not present a question of first impression but is similar to and controlled by *Van Zanten v National Causalty Co,* 333 Mich 28; 52 NW2d 581 (1952). In that case, plaintiff was injured in an automobile accident at the time he was covered by a group accident and health policy issued to his employer. Like the policy here, that policy provided for automatic termination in the event the insured member terminated his membership with the group. However, that policy also provided that if membership was terminated while the member was wholly and continuously disabled, the policy was automatically extended for 90 days. Because he could not work, plaintiff's policy was terminated November 1, and, under the 90-day clause, his employer paid for all expenses up to February 1. Plaintiff sued claiming he was entitled to expenses incurred after January 31. The Supreme Court first noted that insurance contracts should be interpreted in favor of the insured but found the rule inapplicable since the provisions for termination were not uncertain or ambiguous. Quoting from *Hawthorne v Metropolitan Life Ins Co,* 285 Mich 329, 335-336; 280 NW 777 (1938), the Supreme Court said:

"Group insurance policies are issued to the employer to insure employees. One who is not an employee is not insurable. The employee is entitled to coverage under the certificate issued to him only while he remains in the employ of the employer and upon payment at the beginning of each month of the premium upon the insurance policy. *Aetna Life Ins Co v Carroll,* 188 Ark 154; 65 SW2d 25 (1933). No recovery may be had upon an insurance policy for the death of one who has been an employee of the insured under a group policy after the termination of his employment *(Colter v Travelers Ins Co,* 270 Mass 424; 170 NE 407 [1930]), except in strict compliance with the terms of the policy. *Nelson v*

*Aetna Life Ins Co of Hartford, Conn,* 115 Pa Super 15; 174 A 624 (1934). The very purpose of the group insurance is to safeguard or provide for employees. It would be unreasonable to conclude the policy would inure to the benefit of those who have ceased to be employees." *Van Zanten,* p 40.

Contrary to the claims of both plaintiff and defendant, we do not find *Van Zanten, Kitsap,* or *Dysart* controlling. Unlike the situation here, all involved suits by the subscriber against the insurer. None involved a situation where the subscriber's medical and hospital expenses had been paid and the dispute was over which of the two insuring companies should be charged with such costs. Thus, the instant appeal does present a question of first impression. Furthermore, *Kitsap* is also distinguishable in that there the defendant insurer changed the terms of the coverage when it renewed the group contract for another year.[2] In the instant situation, the insurer made no changes in the coverage nor did the insurer remove the subscriber from the payroll.

We have found no case either in Michigan or in other jurisdictions involving a contest between two otherwise liable insurers concerning which policy covers claims for medical treatment and hospitalization furnished at a time when the policy is no longer in force. However, we have found a few cases where the dispute is between the insured subscriber and the insurer. These cases are summarized in Anno: *Elimination of Particular Cover-*

---

[2] In *Kitsap,* the insured suffered a kidney ailment which required hemodialysis. Defendant, a health care provider under the provisions of a one-year renewable contract, paid for the treatments but then excluded hemodialysis when it renewed the contract for another year. The Washington Supreme Court held the contract was ambiguous and that the plaintiff's rights became "vested" when treatment became necessary, so later termination of the policy did not cut off the right to treatment.

*age, or Termination, of Health, Hospitalization, or Medical Care Insurance Policy As Affecting Insurer's Liability for Insured's Continuing Hospitalization or Medical Expenses Relating to Previously Covered Illness,* 66 ALR3d 1205. The annotation deals with liability under health or hospitalization care policies as distinguished from the insurer's liability under an accident policy. Only cases in which hospitalization or medical treatment had begun prior to termination of the policy are included in the annotation.

The cases come to conflicting results depending upon the court's construction of the language in the policy as to the particular risk involved. Does the policy insure against expenditures arising out of an accident or does it insure against expenditures for services rendered while the employee is a member of the group? Stated another way, is it a health-accident policy or is it a medical expense policy? Often the courts find the policy ambiguous as to the risk insured. Where the court finds the language concerning the risk to be covered ambiguous, application of the rule that ambiguity is to be construed against the insurer and in a manner favorable to coverage results in a decision against the insurer. This was the rationale employed by the court in *Kitsap, supra.* Likewise, it was the rationale followed to find the insurer liable in *Houghton v American Guaranty Life Ins Co,* 692 F2d 289 (CA 3, 1982), in the dissenting opinion in *Dysart, supra,* and in *Danzig v Dikman,* 78 App Div 2d 303; 434 NYS2d 217 (1980).

On the other hand, where the court finds the contract to be a hospitalization and *medical expense* policy rather than an *accident* policy and where the language is unambiguous, the insurer is not held liable for expenses incurred after the

subscriber is no longer on the payroll. As was stated in the majority opinion in *Dysart, supra,* p 972:

"We think the trial court erred. While the court's rationale may, in proper instances, be applicable to an accident and health policy, it is not applicable to hospitalization and medical expense policies which afford benefits only during the time of coverage. Here, coverage was provided to the plaintiff as a Blue Cross/Blue Shield group subscriber. Continuation of that coverage was to be furnished in consideration of payment in advance of the rates applicable for the type and extent of coverage specified in the contract. Thus, it appears coverage, to be effective, is dependent upon continued payment of premiums by the subscriber. It seems, therefore, axiomatic that upon termination of the contracts and cessation of premium payments, the only coverage available is that stipulated in the contracts. We note the lack of any stipulated posttermination benefits in the contracts in this case."

Similarly, in *Wulffenstein v Deseret Mutual Benefit Ass'n,* 611 P2d 360 (Utah, 1980), the defendant insurer was not found liable for medical expenditures resulting from an automobile accident which occurred while plaintiff was gainfully employed but which expenses were incurred after she was dismissed from the payroll. There, defendant issued to plaintiff's employer a "Group Hospital, Surgical, and Medical Expense Insurance Policy". The policy provided "[t]he insurance of an employee shall automatically terminate immediately upon * * * (1) The date termination of his employment occurs". On December 28, 1973, while still on the payroll, plaintiff was injured in an automobile collision. She was granted a leave of absence (during which time she was still considered an employee by the terms of the policy) but thereafter on April 1, 1974, her employment was

terminated. Defendant honored her medical expenses through March 31, 1974, but declined to pay any expenses incurred after March 31, 1974, including claims for surgery in January, 1975. Plaintiff sued contending that the right to payment for all expenses whenever incurred vested at the time of the accident. Defendant claimed that it was liable only for those expenses incurred during employment.

The Utah Supreme Court examined the policy language to determine the risk that was insured, was it the illness or accident or was it medical expenses incurred while employed. Finding that the risk insured was medical expenses, the court held:

"The policy involved here could have been an accident or sickness policy, in which case the risk insured against would have been an accident or illness, and rights to any claims arising therefrom would have vested at the time of the accident or illness. However, the policy issued by the defendant was not an accident or sickness policy, but a medical expense policy. As the District Court found, the risk insured against was the incurring of expenses, and until expenses were incurred there was no loss. Thus, defendant is not liable for expenses incurred after the coverage terminated. An analysis of the language of the policy makes this clear." 611 P2d 361.

The court then proceeded to reject plaintiff's heavy reliance on *Myers v Kitsap, supra,* noting that the policy in *Kitsap* was ambiguous:

"The Washington Supreme Court held that the contract was ambiguous, and that the plaintiff's rights became vested when medical treatment became necessary, so later termination of the particular policy in force at that time did not affect that right to treatment.

* * * The Court in *Myers* appears to have reached its result by a keen concern to protect the plaintiff in an unusual situation. Unlike *Myers,* this policy is not ambiguous, and its terms clearly extend coverage only for expenses incurred by employees. But if *Myers* can, *arguendo,* be cited as authority for us to reverse here, we choose not to follow it." 611 P2d 363.

The necessity of carefully distinguishing the risk insured in an accident and health policy as contrasted with the risk insured in a hospitalization and medical expense policy, noted in the majority opinion in *Dysart, supra,* and in *Wulffenstein, supra,* was also observed by this Court in *Hoehner v Western Casualty & Surety Co,* 8 Mich App 708; 155 NW2d 231 (1967). Defendant insurer had issued a policy containing a provision that it would "pay all reasonable expenses incurred within one year from the date of accident for necessary medical, surgical and dental services * * * for each person who sustains bodily injury, sickness or disease, caused by accident". While the policy was in force, the insured's minor son fell, injuring his teeth. He was taken to a dentist who performed temporary treatment but postponed further treatment until the boy reached more mature physical growth. The insured made claim for the additional expense necessary to repair his son's teeth, but defendant denied liability on grounds that such expenditures would not be incurred within one year. The trial court held in favor of plaintiff and defendant appealed relying on *Van Zanten, supra.* In affirming the trial court, our Court distinguished *Van Zanten* on grounds that there the policy was a group policy negotiated with the union and under which benefits would not be provided once the employee was no longer employed.

"However, defendant has apparently chosen to omit discussion of both the heandotes of the *Van Zanten Case* and several of the comments in the ALR [75 ALR2d 876] annotation wherein the fact that the employee in the *Van Zanten Case* was insured under a group policy issued to his entire union local led that Court to terminate the liability of the insurance company in accord with the clear intent not to provide benefits to any employee once the employee was no longer employed." 8 Mich App 716.

Application of the above described legal principles to the instant situation leads us to two conclusions. First, the language of the policy clearly discloses that the risk insured was not an accident or a described illness but instead was the expense for services incurred as a result of such accident or illness during the period of the insured's membership in the group. The hospital care certificate repeatedly refers to "Hospital Service" (¶ III); "Service in NonParticipating Hospitals" (¶ IV); "Conditions of Eligibility for Hospital Service" (¶ VI). The group benefit certificate commences by defining "services" (§ I), and then tying benefits paid to service (§ II) and then describing in detail what "services" are not compensable (§ III). The master medical benefit certificate also ties benefits to services (Article II) and defines exclusions in terms of services (Article V). Each of the three certificates specifically provides, though in somewhat different language, that the contract is automatically terminated once the subscribing member is no longer on the payroll.[3]

Second, the policy language is not ambiguous

---

[3] "* * * shall be terminated automatically in the event of termination of eligibility of the subscriber for coverage as a member of the group" (hospital care certificate); "shall be terminated automatically in the event of * * * (b) termination of eligibility of the Subscriber as a member of the group through which he enrolled" (group benefit certificate); "this certificate and all rights hereunder shall terminate

regarding the risk insured. Not only is there no language indicating the existence of liability on the part of BCBS for expenses incurred after termination of coverage, there is language expressly saying that upon termination of coverage no further services will be provided. Where a contract is not ambiguous, the rule that the contract will be construed in favor of the policyholder does not come into play. In short, the instant case is governed by the holding in *Wulffenstein, supra,* and the majority opinion in *Dysart, supra,* that the insurer is not liable for expenses incurred after coverage was terminated.

Finally, we do not posit our opinion on these grounds. We find an additional and even stronger reason for affirming the grant of summary judgment in favor of defendant. In none of the cases referred to above has the subscribing member prevailed unless the court, upon appellate review, first found the contract ambiguous as to the nature of the risk insured and then called into play the rule that ambiguity is construed in favor of the party insured. In all of the cited cases the party insured was the plaintiff. But in the instant case, the subscribing member is not the plaintiff or even a party to the suit. As stated earlier, Mrs. Stirdivant will or has had her medical expenses paid, no matter who wins this suit. The dispute is simply between two insurers, one of whom (plaintiff) seeks to avoid liability under its own insurance policy. Under these circumstances, we doubt that Auto-Owners is entitled to the presumptions which could be applied to the subscribing member.

---

* * * if the eligibility of the subscriber for coverage as a member of the group through which his coverage is effected shall terminate by reason of * * * (b) the subscriber having ceased to be a member of the group through which he became enrolled in the program" (master medical benefit certificate).

Accordingly, even if the contract in the instant case were ambiguous as to the risk insured, plaintiff could not prevail.

Affirmed. Costs to defendant.